Filed 6/30/15  P. v. Jackson CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EARL LAMONT JACKSON,<br><br>    Defendant and Appellant. | B259706<br><br>(Los Angeles County<br>Super. Ct. No. TA126860) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick Connolly, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

In October 2013, Earl Lamont Jackson was charged with one count of aggravated kidnapping in violation of Penal Code section 209, subdivision (b)(1);[1] one count of robbery in violation of section 211; one count of rape in violation of section 261, subdivision (a)(2); and one count of forcible oral copulation in violation of section 288a, subdivision (c)(2)(a). The information also alleged as to all counts two prior serious and/or violent felony convictions pursuant to section 1170.12, subdivision (b), and three prior serious felony convictions pursuant to section 667, subdivision (a)(1). As to the rape count, the information alleged that pursuant to section 667.61, subdivisions (a) and (d), Jackson kidnapped the victim and his movement of the victim substantially increased the risk of harm. Lamont pleaded not guilty and denied the allegations.

At trial, the victim testified that after midnight on January 8, 2013, she left her job at a fast-food restaurant and called her boyfriend to let him know she was on her way home. About 10 minutes later, she was stopped at a red light at 112th Street and Central when she heard the front passenger window shatter and saw a strange African-American man jump head first into the car, saying, "'I'm not going to hurt you. Drive.'" The man demanded her money and asked if she had drugs in her trunk. She drove off slowly, telling him she had no money or drugs. He replied that she was a liar. He told her where to turn and she obeyed, afraid he would kill her if she did not comply. Under defense objection, she testified that the man said, "[I]t's not about race. It didn't matter if I was Mexican. If it was a black bitch, he would have did that to her too." He threw some papers from the cupholder out the window and said, "'Let's go rob a bank.'" She told him the banks were closed. She continued to drive until she reached a small parking lot in Nickerson Gardens, where she stopped and he turned off the engine. The parties stipulated that the distance from the intersection to the parking lot was 1.4 miles.

The man took her wallet from the glove compartment, opened it and took the change, and read her address out loud from her identification card, memorizing it. He told her to take her pants off and she replied that he said he wouldn't hurt her. He

[1] All further statutory references are to the Penal Code unless otherwise indicated.

grabbed the softball-sized rock he had used to smash the window and said if she didn't take her pants off he would bash her head in, swinging the rock close to her head. She pulled down her pants and underwear, and he unfastened his pants and told her to put her mouth on his penis. When she said no he grabbed her hair and forced her head down until his erect penis entered her mouth. After a few seconds he let her up, climbed over to her seat, reclined the back, and penetrated her vagina with his penis; she began to cry. After he ejaculated he climbed back to the passenger seat. She pulled her pants up, he fixed his, and when she repeated that she had no money he took her phone, ring, compact discs, and her jacket. There was blood on her right sleeve jacket and he said he did not want to leave evidence behind. He tried to wipe his blood off the center console.

The man then found a bottle of air freshener in the car and asked if it could burn eyeballs out, and she said no. He told her he was going to "call his homies to come get some" and debated whether to kill her or not. She told him she wouldn't tell and he should just let her go home. He looked at her identification again, read her address, and said, "'Just know that I know where you live.'" He stuffed the things he took in his beanie, got out of the car, kicked the door shut, and watched her leave. It was about an hour and a half after he had broken her window and entered her car.

When the victim got home she called 911. The jury heard a recording of the call, in which she described her attacker as having a bleeding cut in the middle of his nose. The police responded to her home and she went to a rape treatment center for an examination, after which she met with a detective and retraced the route. She identified Jackson in court as her attacker with 100 percent certainty, saying she would never forget his face.

During the time in the car, he talked to himself and acted "almost like he was somewhere else a bit," and she thought he was high. The cut on his nose was fresh and he had a deep, bleeding cut on his right hand. She did not recognize anyone in the first six-pack photographic lineup she was shown, which did not include a photograph of Jackson.

A police officer testified that he took a detailed statement from the victim at her home the day of the crime. He saw the car's shattered window and stains on the seats, and recovered a rock from the interior. A police detective testified that he drove the route with the victim to the parking lot, where he found shattered glass. A criminalist testified that swabs were collected of stains inside the car. A stain on the front left backrest tested presumptively positive for semen, and later a criminalist testified that the sample from the driver's seat backrest tested positive for sperm. The nurse practitioner who did the sexual assault exam testified that the victim told her she had been sexually assaulted. The nurse saw small abrasions consistent with broken glass, and vaginal injuries that appeared to be new. She took swabs from the victim's mouth and vagina. The scientist who tested the forensic samples testified that the forensic samples of blood and sperm were consistent with Jackson's DNA profile, with a random match probability of one in 1.0 septillion in the African-American population; there are 24 zeros following the "1" in one septillion. There was testimony from the criminalist who processed Jackson's reference sample and generated the DNA profile. The criminalist who performed the DNA analysis on the rape kit found Jackson's DNA was the major contributor to the mixed sample (the victim was also included), with a random match probability of one in 400 sextillion.

Jackson testified in his own defense. He admitted he was convicted of robbery in 1987 and 1990, and of unlawfully taking a vehicle in 1993 and 2006. On January 8, 2013, he lived near 112th Street and Central. That evening he traded in food stamps for cash and bought bottles of liquor, walked around the corner and got drunk with a friend called Green Eyes. Jackson then walked to Nickerson Gardens, bought crack cocaine, and smoked it. He drank some more and then walked back to Nickerson Gardens and asked a woman named Betty if she wanted to get high. She said yes, so Jackson gave her $20 to buy two bottles of PCP, and Betty and he each smoked a cigarette dipped in the PCP. He felt numb, walked back to Green Eyes's house, and after that he remembered nothing until he woke up at his grandmother's. He noticed he had cuts on his nose and his hand and blood on his pants, but did not remember being in anyone's car. When arrested, he told the police that he got the cut on his nose in a fight. The detective who

4

interviewed him testified that Jackson said, "'I've been having the scar on my nose,'" but he said nothing about a fight.

The jury found Jackson guilty as charged and found the kidnapping allegation true. The trial court denied a defense motion for new trial and found the priors true after Jackson waived trial and admitted the convictions. The court sentenced Jackson to a total of 135 years to life, and he filed a timely appeal.

We appointed counsel, who examined the record and filed an opening brief raising no issues and asking this court to review the record independently. On April 8, 2015, we advised Jackson he had 30 days in which to submit personally any contentions or issues he wished us to consider. To date, we have received no response.

We have examined the entire record, and we are satisfied that Jackson's counsel on appeal has fully complied with her responsibilities and that no arguable issues exist. (*People v. Kelly* (2006) 40 Cal.4th 106, 109–110; *People v. Wende* (1979) 25 Cal.3d 436, 441.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


BENDIX, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.